trials for separate drug conspiracies, what I label the Bailey conspiracies and the Boutron conspiracies in my briefs. Both of those conspiracies involved multiple drug transactions and then also the instant murder trial. And as a result, the state was able to paint a picture to the jury that Mr. Sarah was a bad person who associated with bad people who sold a lot of drugs and did bad things. This was a classic guilt by association strategy, and it worked. Sarah was prejudiced by this erroneous admission of this other crimes evidence because it resulted in the reasonable probability that the jury convicted him based not on his actual accountability for the murders he was on trial for, but instead based on his alleged association with the principal actors in this case, Arturo Ibarra and Raul Segura in the prior drug transactions. Now, the apparent reason for employing this improper guilt by association strategy is that the state really presented no firm evidence tying Sarah to any actual participation in these murders. Instead, the evidence shows that Mr. Sarah merely associated with Ibarra and Segura, and Mr. Segura is the is the person that the state acknowledged in closing argument was the one who actually shot the two victims in this case. But mere association or presence is not legally sufficient to convict someone beyond a reasonable doubt of multiple murders. The state invites this court to essentially speculate that Mr. Sarah was accountable, but speculation is not the same thing as making a reasonable inference based on admissible evidence. Now, looking at the legally admissible evidence in this case, there was no DNA or fingerprints that specifically links Mr. Sarah to the crime scene. Mr. Sarah did not make any any statement admitting his actual participation in these murders, and there was no eyewitness testimony. Now, granted, the state did put on evidence tying Sarah to Mr. Ibarra and Segura, but that evidence falls short of proving that he was accountable because the evidence failed to prove that Mr. Sarah shared the criminal intent of Mr. Ibarra and Segura or that there was a common criminal design. Now, just briefly summarizing the state's evidence in this case, there was evidence that Mr. Sarah had the gun and he had four thousand dollars. We can't get around that. But again, the state in closing argument admitted that Mr. Sarah was not the trigger man here, that it was Mr. Segura and that the gun was later recovered in Mr. Sarah's apartment. So the evidence does show that he possessed the gun after the murders, but not necessarily before or during those murders. So we can always. I'm sorry, but they have his statement that the gun is his. He's never let anybody use it. He bought it himself. Butrone leaves the house at nine o'clock and the defendant is back at his house between 10 and 11 with the murder weapon in less than two hours. You don't think that ties him to the murder scene, that the gun is back in his house and he doesn't follow his normal routine that day and doesn't pick up his kids? And you don't think that that ties him? How does he get the murder weapon when Mr. Butrone leaves the house at nine and certainly by 11, no later than 11, the defendant is back home with the murder weapon? How does he get it? Well, Your Honor, that is that is certainly evidence tying him to to the principles in this case. I mean, what is the murder weapon and the murder weapon? We don't we don't know why he admitted the weapon was was his, but he did make that statement. Yes, absolutely. The evidence, the CSLI evidence showed that as of six fifty two, he was in the area of those murders and that he was back in the area of his own home, which was at 5631 South Trumbull. That was at nine fifty two. So not 11 p.m., but nine fifty two p.m. He was back in the area of his own home. So we still have to speculate with the gun. Then you make the time shorter. Counsel, which was leaving his house at nine and by nine fifty two, the defendant's back home with the gun. You just tied him to the murder weapon and to the murder even closer. I gave you a bigger window because of that. Was it Don Hughes testimony that he's there between 10 and 11? I'm ignoring the cell site information. I'm ignoring the cell site. I'm talking about if this is because you challenge the cell site information. If we don't consider the cell site information, we have his girlfriend saying he comes in the house between 10 and 11 and with the gun and has her play with the gun. Yes, yes, your honor, we obviously we can't deny that he didn't have the gun after the fact, but we but we still don't know what happened between six fifty two and when the actual murders occurred. Whether we know that now we know the murder didn't occur before nine. Your window is not seven. Your window is nine to ten or nine to eleven. That's the only window that's important. Right. So so what we have is Mr. Sutter with the gun after the murders. We don't know that he was actually present during the actual murders. We know that the state's theory is that Segura was the person who used the gun. But yes, we can't deny that he had the gun after the facts and brought it home. Yes. Let me ask you this. Cannot the trier of fact make a reasonable inference from that evidence? Yes. Yes, it can. It can. But our position is that there was again, there's no evidence that actually putting Mr. Cerda at the scene at the time of the murders. Well, there's circumstantial evidence. This is a circumstantial evidence case. Yes, your honor. It is circumstantial evidence case. And a person can be convicted from circumstantial evidence. Can they not? That's that's the standard. Our position is, is that this is this is more speculation than direct evidence. And Mr. Ziva, I'm not John. You know, I'm not this. This is a very interesting case. Your brief was really well done. So is Mr. Nowak's. It's just like as, you know, to me, like a blind man could see the road map to the defendant. And in this case, you say there's nothing but the gun. But doesn't he have. Is it a jacket or I can't remember the sleeve of the jacket that has gunshot residue on it? Yes. Well, there are women. So there's gloves and a car, two different sets. One has what's his name? Segura's kids names on each glove. And I think there's DNA that can't exclude Ibarra or Segura. And even I think the defendant from one of those gloves. There's gunshot residue, at least on one object that he has, along with the murder weapon. But the gunshot residue wasn't tied to Cerda and there was no DNA specifically tying him. But yes, there is evidence that he did have those things in his trunk after he went to Ibarra's house the next day to retrieve things from from the garage. So perhaps it might be most beneficial for all of our time for me to move on to the next issue, which I think is our is our best issue. And that's notwithstanding the state's evidence that they had. They did go on to present evidence of these other two drug conspiracies involving the Bailey brothers and another gentleman, and then also what I'm calling the Boutron brothers. And that really muddied the waters in this in this murder trial because it inundated the jury with this other crimes evidence purported purportedly to establish Cerda's identity and the existence of a common plan or a design. But the sheer amount of that evidence presented regarding these two drug conspiracies was excessive. And the state's first four witnesses testified about them almost exclusively. And this resulted in two improper mini trials on whether Mr. Cerda was involved in the two drug conspiracies. And that resulted in the real possibility that if the jury was convinced that Mr. Cerda was involved in the two drug conspiracies, that he was involved in the incident murders and accountable for their actions. A couple of main points as to this argument, your honors. Number one, as to both of these drug conspiracies, no evidence was presented that Mr. Cerda did did anything other than just be present. There was no testimony that he said anything during these transactions. Nobody testified that Mr. Cerda ever threatened anyone or displayed a weapon. And number two, perhaps the most damning of this other crimes evidence that came in was testimony from Mr. Renor MacDonald, who testified regarding the Bailey conspiracy. Mr. MacDonald testified that he spoke to Stephen Bailey and Mr. Bailey told him that he was going to be going with his brother Tyrese, along with Crawford Davis, to buy drugs from Mr. Rebarra. And Renor MacDonald asked Stephen to call him after that drug transaction to let him know about how it went, how the what the quality of the drugs were, because he himself was going to buy drugs from Rebarra the next day. But critically, he testified that he never got that call. And also notably, there had been a pretrial motion regarding the separate triple murder of the Bailey brothers and Mr. Crawford, and the trial court agreed that that would be too prejudicial for that information to come in. But it wouldn't take much for the jury to read between the lines here. We have a person testifying about a drug deal and wanting to be called back about it and then never receiving that call. There's certainly a possibility that the jury could have concluded that something very bad happens as a result of that drug transaction. I just thought of something misperceived, and I'm not sure if I'm correct. You can correct me if I'm wrong. That statement that he'd never heard from him. Isn't it like a month before the murder? So if he thought somebody got knocked off, why would he go ahead with the drug deal a month later? I just thought that because I'm thinking one is in April and then one is in May. Am I correct? Well, they involve different parties, Your Honor, the one I'm talking about in terms of the time. They that it was a third, I think one is in April, whereas the other one is at least three weeks, almost four weeks later that they have this other. But I think it's set up and sounded like it reads like a set up to me, certainly where these three people are murdered. Well, that's certainly the insinuation. That's I think what what the evidence is trying to get across by the state. But I think we might be confusing parties. I'm talking about the Bailey Brothers conspiracy where Norris McDonald was not involved in the transaction that resulted in the murders of the Bailey Brothers and Mr. Crawford. Yeah, I understand. Yeah, I understand that. But what I was saying is you're saying the jury thinks because they did that McDonald didn't hear from the Bailey Brothers after April 21st or whatever it is, 22nd, that they would then think that May 18th, when these people are murdered, that the other two people or three people, whatever it is, have been killed and and nobody knows about it. And these other people go ahead with the drug deal. That's what I'm saying. Well, but they're involving different people. What I'm what I'm saying is that the jury has been kind of led along the path of of there are a number of drug transactions that occur and then something bad happens. That's certainly the argument that's being made as far as the murders that Mr. for. There were drug transactions and that led to kind of a modus operandi, if you will, about setting up initial transactions that eventually lead to a murder. And that's that's precisely my point is that in this Bailey Brothers transactions, the jury isn't told definitively, obviously, that they were murdered by Mr. Barton and Mr. Cerda. But I'm saying that they could certainly read between the lines that when they knew that the Bailey Brothers and Mr. Crawford were going to this drug transaction with Mr. Ibarra, Mr. McDonald says, call me back after so I can know about the quality of the drugs and how things went. But he's never called. I'm saying that it wouldn't take much for a juror to come to the conclusion that maybe something bad happened to them. All right. What you're telling us, what you're telling us is that this evidence was so prejudicial that the defendant could not receive a fair trial. This is true. And that's but I'm just emphasizing probably the most damning point. But looking at just the sheer volume of these other transactions in both of the conspiracies, the jury has heard about multiple drug transactions that allegedly involve Mr. Ibarra and Mr. Cerda and that the state could have could have put on, you know, certainly fewer than four witnesses that talked about fewer transactions to get the identity of Mr. Cerda or get any type of alleged common plan. This was just overkill. And that extreme prejudice certainly outweighed any probative value that that evidence had, because, again, its admission resulted in the real possibility that the jury convicted Cerda not for any actions or accountability he had in these murders that he was on trial for, but because they heard about all these other drug transactions where he was just present with Mr. Segura and found him guilty because of that, that could have could have tipped the scales if the jury had had any any doubts based on the direct evidence, certainly in light of the fact that there's no eyewitness testimony. Putting him there and no inculpatory statement that he actually participated in the murder that that could have tipped the scales and resulted in his and the jury jury finding him guilty. OK, now you've already passed your time. You want to save some time for rebuttal? Sure. I'll just quickly say that I urge this court to either reverse its convictions outright pursuant to argument one or pursuant to argument to reverse and remand for a new trial. Thank you. Are there any questions by any members of the panel? I have none. Thank you, counsel. OK, thank you. No questions. Thank you, Your Honors. And may it please the court again, my name is John Nowak, I'm an assistant state's attorney on behalf of the people. Your Honors. There was a significant amount of guilt of defendants accountability for these murders, aside from the prior drug deals, aside from the cell phone records. Defendants car was seen on video fleeing from the scene shortly after the murders. The gun found at defendant's apartment was the same gun that fired the 40 caliber bullets that were found in the victim's bodies, the same gun that fired the 40 caliber bullet and the cartridge case that were recovered from the victim's car. And following the murders, defendant returned home with $4,000 and that very same murder weapon, the 40 caliber gun. Later, defendant admitted that gun, the murder weapon was his and that he'd had it prior to the murders. On top of all that. Again, defendant's car was seen fleeing on video and the jacket in defendant's trunk had gunshot residue on it. The jacket in defendant's trunk matched the DNA of co-offender Segura and the other co-offender, Ibarra, could not be excluded from the DNA found on that jacket. In addition to that, the glove found in defendant's trunk had gunshot residue and it contained a major male DNA profile and defendant was a possible donor. This evidence, aside from the prior drug deals, aside from the cell phone records, is significant evidence that this defendant participated and was accountable for the murders of these three men. As to the other crimes evidence, again, this is reviewed for an abuse of discretion, and it was not the focus of this trial. It amounted to about 70 pages in the transcript out of 1500 pages of the trial. This was not merely guilt by association. He did more than merely associate with Segura and Ibarra. These prior drug transactions showed that defendant was there as the silent lookout, the watchdog, the enforcer, and it showed that they, these three men, would routinely participate in drug deals in this manner. They showed his identity and their common plan of design. And this led up to the fiance of the victim, Boutron, testifying her involvement with prior drug deals with defendant and the two others, but also led to her testimony about the night she didn't go, the night of the murders, as it turned out. It led to her testifying that the three victims, Boutron and the other two men, Allequin and Romero, they planned on a drug deal with Ibarra. And they ended up, they planned it for around 9 o'clock p.m. And then, of course, all three men are found dead in a car close to where defendant's car is recorded fleeing around 9.30 p.m. This was more than guilt by association. The focus of the trial here, though, was on defendant's car fleeing from the scene. Defendant's, the gun of defendant that he admits is his as being the murder weapon is found in his home. He admitted it was his, and with everything else, the rest of the forensic evidence here. The trial court did not abuse its discretion here. This evidence was probative. Any prejudicial value it had, any unfair prejudice was far outweighed by the probative value here. The evidence here proved this defendant guilty beyond a reasonable doubt. And for these reasons, and for those in our briefs, your honors, in case there, if there are no other questions, if there are no questions, we ask that this court affirm defendant's convictions. Are there any questions by any members of the panel? I don't have any. Okay, then let's hear the rebuttal. You're muted, counsel. I apologize for that. Thank you, your honor. There are no questions for the state's attorney. Okay, well, I'll be very brief then. I'll just say that, you know, there's again, there was no direct evidence putting Mr. Cerda at the scene. There's certainly evidence to support his guilt for an accessory after the fact. And as to issue two, I mean, the prosecutor did does mention this in his closing argument. There is reference to McDonald's testimony. There is reference to these other crimes. So again, I'll just ask this court to reverse Mr. Cerda's conviction outright or pursuant argument to reverse and remand for a new trial due to the excessive other crimes evidence. Thank you. Any questions by any members of the panel? No, thank you. All right. Well, we thank you for giving us this very interesting case. I think you guys did a wonderful job in your briefs and in your oral arguments and we'll take this case under advisement and you'll have a decision shortly and the court will be adjourned.